The Backus Associates, Inc., *v.* The State of Ohio, Dept. of Natural Resources.

(No. 75-0325—Decided April 8, 1976.)

Court of Claims.

*Mr. Cedric Vogel,* for plaintiff.
*Mr. William J. Brown,* attorney general, and *Mr. Steven L. Ball,* for defendant.

TROOP, J.   The Backus Associates, Inc., entered into a contract with the state of Ohio, Department of Natural Resources, to do work, supply materials and furnishings for the interior of Salt Fork State Park Lodge, and auxiliary units, located in Guernsey County, Ohio.

A copy of the contract "CONTRACT III—LODGE & UNITS —INTERIOR FURNISHINGS," was attached to the complaint and indicates that the contract was executed August 22, 1969. Article 6 of the contract provides that the work contemplated by the contract was to be completed within seventeen months after written notice to proceed with the work. The notice to proceed was dated August 27, 1969.

The complaint further alleges that the completion date was extended 189 calendar days by the Director of the Department of Natural Resources without the approval or consent of Backus Associates. The 189 day extension is admitted by the defendant (answer paragraph 7). The plaintiff claims that there was a further delay of another year which delay it did not cause (complaint paragraph 8). Defendant unqualifiedly denies this claim. (Answer paragraph 8.)

Delay, caused by the owner or contractee, is the underlying basis for the complaint of Backus Associates. Plaintiff insists that it was ready and able to complete the contract within the prescribed 17 months and that the 189 calendar day delay and the additional year delay increased its materials costs 5-½%; increased its labor costs 15-17%, and added overhead and loss of profits. Plaintiff claims the amount of increased material and labor costs, as $45,-187.80 and the amount of added overhead and loss of profits as $175,187.80. Further, plaintiff claims it provided certain items not called for in the contract and incurred extra labor and materials costs for these items.

Attached to plaintiff's complaint is "SCHEDULE A"

which itemizes certain materials and labor costs for items plaintiff claims were not required by the terms of the contract and which were later supplied by plaintiff at the request of the Chief Engineer for the department. The total amount claimed for the additional items listed in "SCHEDULE A" is $36,448.28. This "SCHEDULE A" should not be confused with a paper denominated "EXHIBIT 'A'" which is also attached to the complaint. "EXHIBIT 'A'" dated July 24, 1969, is part of the contract.

In total plaintiff seeks $256,823.88. A substantial portion of this amount rests upon claimed delay caused by the state of Ohio. Because of the importance of delay, attention is directed to some basic law relative to contractual delay. In a recent unpublished decision of the Tenth District Court of Appeals, in *John P. Novatny Electric Company* v. *State of Ohio, Department of Public Works*, Case No. 75AP-306, issued December 2, 1976, the court, at page 2929, quoted from, 13 Am. Jur. 2d, page 53 (Building and Construction Contracts, Section 50), as follows:

"In the absence of contractual provisions to the contrary, a building or construction contractor has a right to recover damages resulting from a delay caused by the default of the contractee. * * * In order for a contractor to recover in such a case, however, it must be shown that there was a default by the contractee, that this caused a delay in the work of the contractor, and that the contractor was damaged by the delay. * * *"

Ohio decision law follows this basic rule. One decision of the Ohio Supreme Court is particularly noteworthy. In *Visintine & Co.* v. *New York, Chicago & St. Louis Rd. Co.* (1959), 169 Ohio St. 505, the Supreme Court held that the state of Ohio owed certain duties to the contractor. The court, at page 508, speaks as follows:

"Among those duties was that of providing plaintiff with a site on which it could perform its work without hindrance or delay and of doing those things which it promised to do at such time and in such manner as would not hinder or delay the plaintiff."

In summary, for the state of Ohio to be liable it must be shown that the state owed a duty, that the state breached

the duty and that the breach was the immediate cause of plaintiff's damage. Applied to this case this means that if the breach—the hinderance or delay, if any—is not directly the fault of the state there is no liability. In a more positive statement this means that if there is no contractual provision to the contrary, the contractor has a right to recover damages from the contractee, the state of Ohio, for a delay caused by the state of Ohio. Finally, it must be noted that the burden of proof is upon the contractor.

The basic document upon which the contract of Backus with the state of Ohio is predicated is in evidence marked Joint Combined Exhibit No. 2. (Hereafter trial exhibits will be referred to by complete name, e. g., "Joint Exhibit No. 2 or as J. Ex. 2.") The documents concerning delays are found in J. Ex. 2 at G. C. 4, paragraph 4. The contract provides that delays due to the fault of a contractor that result in his work not being timely completed subject the contractor to liquidated damages at a per diem rate (J. Ex. 2 at G. C. 1 para. 4(a)); that an extension of time could be granted the contractor and; that all claim for extensions of time for delays not caused by the contractor must be made in writing ". . . by the Contractor to the Engineer within three . . . days of the occurrence of such alleged delay." (J. Ex. 2 at G. C. 1 para. 4(c).)

The contract contains other pertinent provisions. The contractors are charged with the development of actual work scheduling under the "critical path scheduling" method. Under this method the consultant, here an architectural firm, develops a basic schedule and the contractors are required to communicate with the consultant, and one another, and actually develop the work schedule. In addition, this contract specifies the starting time and the completion time. In this case Backus was given notice to proceed on August 27, 1969, and the completion date under the contract was ". . . within seventeen . . . months after written notice to proceed with the work." (J. Ex. 3, page 2 at para. 6, also see J. Ex. 2 at G. C. 15 para. 24.)

Mr. Harry Backus, president of plaintiff corporation, was its principal witness. He is experienced in the field of interior design having rendered service in his field forty-

eight years during which time he designed and created the interiors of many public buildings throughout the country.

Mr. Backus testified that there was delay in the completion of Salt Fork State Park Lodge and auxiliary buildings. He testified that it took 1322 days, or more than three years, from the date of award to finish Salt Fork. The originally designated length of construction was seventeen months, or approximately 510 days. When asked as to the *why* of the delay he suggested that there was a continual delaying process by all parties. When pressed on cross-examination as to the cause of delay, the witness suggested that no one knew the cause and further suggested that delay occurred before he got on the job. When his attention was directed to possible strikes as causes for delay, the witness stated that he thought there were some strikes before and after he arrived on the job, but added that he had no knowledge of the causes for the delaying strikes.

Mr. David A. Swartzmiller, Chief Engineer for the Department of Natural Resources, who administers all of the construction and improvements projects for the department, testified that during the construction period at Salt Fork there were a number of strikes which caused $199\frac{1}{2}$ days delay and that adverse weather caused a loss of work time for 102 days, and that these figures totaled to $301\frac{1}{2}$ days of delay which could not be attributed to the contractee—the State.

While Mr. Backus admitted lost time due to strikes he insisted that he had no knowledge as to the cause of strikes. He offered no testimony as to a specific cause of delay except to say that there had been a continual delaying process—"by all parties." This statement seems to include Backus Associates along with all of those responsible for the progress of construction at Salt Fork.

This case is distinguishable from *Visintine, supra.* In *Visintine* the state of Ohio, by contract, had a duty to timely supply a site upon which contractors could work. The duty of the state of Ohio was unmistakable in *Visintine.* In this case plaintiff has not shown that the delay which did occur, was caused by the defendant.

No governmental unit, not even the state of Ohio, can control the weather or nullify a strike vote by a labor union. The plaintiff has offered no evidence, much less a preponderance of the evidence to prove "that there was a default by the contractee," the state of Ohio, Department of Natural Resources, and "that this caused a delay in the work of the contractor."

The plaintiff, through Mr. Backus, did develop a measure of damages attributable to the claimed delays. Under this measure the alleged delays increased material costs and labor costs totaled $45,187.80. Mr. Backus then moved to the more nebulous claim of loss of profits and increased overhead. It is alleged in the Backus complaint that the delay caused damages in these areas totalling $175,187.80. Mr. Backus attempted to establish this figure through the use of the last page of Plaintiff's Exhibit A, which is now marked Defendant's Exhibit 4. The last page of Plaintiff's Exhibit A (Defendant's Exhibit 4) is something of a summary sheet titled "ACCOUNTING FOR THE ABOVE." "THE ABOVE" is plaintiff's "BID SCHEDULE" (Plaintiff's Exhibit A), which comprises the items upon which the plaintiff based its bid with the Department of Natural Resources.

Defendant's Exhibit 4 lists "miscellaneous expenses" for the years 1968 through 1973 to which is added overhead for the duration of the contract plus 10% for profit. Along side the typed items and totals are adjusted figures in ink and a new overhead and profits figure of $145,365.11. None of the figures supplied relate to the alleged increase in overhead and accompanying loss figures. This alone is a bit baffling.

However, there is a much more serious objection to this evidence. If in fact the state of Ohio were liable for delay, the damages could never be proved by this informal—to say the least—memorandum. When Mr. Backus was asked on recross-examination as to the source of Defendant's Exhibit 4, he replied that the figures were typed by the bookkeeper and that the written figures were his own.

The old "shop-book" rule precludes the use of such material. The material is not a book of original entry nor

was it presented by one in charge of its preparation. R. C. 2317.40, is precise as to this kind of evidence. The section reads in pertinent part, as follows:

"A record of an act, condition, or event, insofar as relevant, is competent evidence if the custodian or the person who made such record or under whose supervision such record was made testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission."

On the delay questions the court finds that plaintiff did not prove that the state of Ohio was liable for any fault or delay which prevented the plaintiff from completing its contract, and that even if such fault or delay was for argument assumed to be proven that the resulting damages could not be established by the kind of evidence introduced by this plaintiff.

The remainder of this discussion is directed to plaintiff's "Schedule A" attached to its complaint. "Schedule A" reflects differences between the parties as to specified items in the contract. These differences concern interpretation of drawings and specifications, duties of the contractor, and claims for necessary overtime. The items can be grouped for discussion.

One group involves differences between the plans and specifications. Plaintiff claims it supplied two additional stencils and two additional lobby lights. It appears from the testimony of Mr. Swartzmiller, Chief Engineer, that the specifications (J. Ex. 2 at 12J-41) in each instance called for two units when the plans (J. Ex. 1, Sheet No. ID-12) called for four units.

It is this court's view that the department is responsible for such a discrepancy between the plans and specifications and that a bidder might properly rely upon either assuming that the consultants would provide plans and specifications which are consistent. Plaintiff should be paid for these extra items furnished.

Another smaller item should be disposed of promptly.

The plaintiff says that Mr. Swartzmiller was unhappy with the support which had been furnished when mirrors had been installed. The plaintiff says that he used an ordinary wire and hook arrangement which he believed satisfied specifications but that the chief engineer required a lead nosed hanging device for greater safety. It appears that wire and hook devices were commonly used and standard. Furthermore, Mr. Backus insisted that the consulting firm approved the use of the wire and hook. Mr. John Schaal, plaintiff's job supervisor, testified that notwithstanding the earlier approval of wire and hook he was directed by the architect to use the lead nosed device after the lodge had been opened. The lead nosed gadget would appear to be beyond requirements of the contract and therefore compensation should be allowed.

There are a variety of claims for overtime pay which plaintiff's witnesses say were authorized and which defendant's witnesses consistently deny. Defendant's claim that overtime could not be allowed by any subordinate officer and that in fact no written approval for payments of overtime had been allowed in any instance.

"SCHEDULE A," item 6 (SCHEDULE A is attached to plaintiff's complaint), exemplifies such overtime claims. Mr. Schaal testified that plaintiff's workmen were ordered to standby to install certain booths in the coffee shop of the lodge. He further said that the booths were not included in the specifications and that to accommodate the rush toward completion in anticipation of opening day it was necessary to work overtime. If indeed the item was not specified, it would seem that payment for the item was reasonable. This is particularly so when some facets of the evidence favorable to the plaintiff were not effectively controverted.

The next item to be considered in plaintiff's "SCHEDULE A" is numbered 10 and refers to thirty-six lavatory fixtures for the studio units. The court's search of the pertinent specification "PREFIX 'SD' STUDIO DOUBLE" (J. Ex. 2 at 12J-58 and 59) fails to disclose any mention of the thirty-six "lavatory lights" which defendant claims are required by the contract and which defendant required plaintiff to

install. In searching the drawings, the court did find a requirement for seventy "DD19['s]," thirty-six "DB19 ['s]" and thirty-six "SD19['s]" and that these items are wall mounted light fixtures. Interestingly, item SD19 is identified as a *studio bed* and not a light fixture in the specifications applicable to "STUDIO DOUBLE[s]" (J. Ex. 2 at 12J-59). It is the court's opinion that plaintiff was not under an obligation to cast about in the intricacies of the contract looking for a reference to lighting fixtures which reference did not appear in the "STUDIO DOUBLE" specifications or the "STUDIO DOUBLE" drawings.

The claim for lavatory lights should be recognized and paid.

The two remaining groups of claims are more troublesome than the foregoing. The first group pertains to the carpeting of areas which the defendant says are clearly covered by the plans and which the plaintiff contends are not covered by the plans or the specifications. Disputed overtime is the sizeable facet in this particular group. The second group of claims concerns lighting fixtures. The court will consider the "carpeting" claims first.

There were three areas for which carpenting was demanded by the defendant. It is claimed by the plaintiff that the payment of overtime labor was required in order to accomplish the timely laying of the carpet. The areas were the balcony dining room, the corridor between the game room and motel unit, and corridor number eleven adjacent to the meeting room. Claimant says that this carpeting was not required by the contract.

This court is well aware of the enormity of the task confronting a bidder responding to a request for bids offered by a governmental unit. Sympathy for such a bidder is engendered by the necessary effort of a court confronted with the task of analyzing such a contract for judicial purposes. The sheer volume of plans and specifications and the intricate relationship of the emerging contractual arrangement increases the weight of judicial review to a point approaching the intolerable. Regardless, plans and specifications are controlling and must be examined.

The "GENERAL CONDITIONS" contained in the instant

contract provide a starting point in the discussion of "carpeting." Specifically, the carpeting herein was installed by plaintiff in the balcony dining room, corridors between the game room and the motel units, and corridor number eleven.

That the minute detail as to carpets must be respected is emphasized in the "GENERAL CONDITIONS" of the contract (J. Ex. 2 at G. C. 15). Pertinent portions of the "GENERAL CONDITIONS" read:

"25.

"EXAMINATION OF DOCUMENTS:

"a.) Each Bidder shall examine all Contract Documents, including the Drawings and Specifications for all other divisions of the Work as well as his own, noting particularly all requirements which will affect his work in any way. Failure of a Bidder to fully acquaint himself with amount and nature of work required to complete his division of the Work in conformity with all requirements for the Project as a whole, will not be considered subsequently as a basis for extra compensation.

"b.) Should any requirement in the Drawings and/or Specifications for the Project as a whole appear to a Bidder to be in disagreement with those for the part of the Work on which he proposed to bid, a request for clarification, in writing, should be addressed to the Office of Chief Engineer at least fourteen (14) days prior to the dates set for the opening of Bid. * * *."

The contract instructions move toward the particular; e. g., Section 12B (J. Ex. 2 at 12(B-1) is a section devoted to "Carpet" and has subsections entitled, "GENERAL," "MATERIALS," "INSTALLATION" and it concludes with "CARPET SCHEDULE" (J. Ex. 2 at 12B-2). The general areas in which carpet is required to be installed appear in the "CARPET SCHEDULE" which is a comprehensive summary of carpet requirements. Among the specifically designated areas are—"Balcony Dining, Meeting Rooms, Stair No. 11 and 'remaining areas.' "

On the very bottom of the CARPET SCHEDULE, as though to warn of possible oversight is the direction—"See Room Finish Schedule."

Following that direction a bidder, or a court, must check the ROOM FINISH SCHEDULE (Defendant's Exhibits 2 and 3, Sheet No. A-13, A-14 Lodge). The column headed "carpet," under the broader heading "Floors," indicates that carpet is required for "29.4 Balcony Dining," "11 Stair No. 11," and "11—Corridor."

Throughout the hearing on this cause plaintiff, Backus Associates, Inc., insisted that its "bid schedule" (Plaintiff's Exhibit A) was not only the basis of its bid, but was determinative of its contractual obligation. An examination of Plaintiff's Exhibit A indicates that it is a series of entries taken in exact order from "SECTION 12J ITEMIZED SPECIFICATIONS," of J. Ex. 2 beginning at page 12J. The first item shown on Plaintiff's Exhibit A is "Item No. G-1 TABLE TENNIS SET." The itemization continues faithfully to the end of the section, except as to certain combinations of figures and other indicia the copier elected to include.

Nowhere in Plaintiff's Exhibit A, or elsewhere in the evidence, is there any indication of any effort to relate the listing in Plaintiff's Exhibit A to any basic schedule or plan.

Plaintiff seeks to rely solely upon its Exhibit A as respects "carpet" and as other items to be included in its total bid. No explanatory detail as to "carpet" by areas or relation to schedule or plan appears in Plaintiff's Exhibit A. Plaintiff used its own device and totaled the carpet contracts. On page five of the "bid schedule" (Plaintiff's Exhibit A) there is an item numbered 31, which reads as follows:

"ITEM No. LL-18 CARPET
Lot $11,000.00 $88,117.56 $99,117.56
(FOR TOTAL CARPET CONTRACTS)"

Thirteen other carpet items, in Plaintiff's Exhibit A, carry this notation—

"(INCLUDED IN No. 79, ITEM GS-4, ON PAGE No. 8)"

Plaintiff's bid schedule shows a gross amount covering all "carpet," without regard to plan or schedule; no discernible effort having been made to relate to the individual parts of that total to plans or schedules.

Plaintiff's "bid schedule" is not a part of the contract presently before this court. If that schedule serves any useful purpose, it serves to demonstrate the casual regard displayed by the plaintiff to controlling documents. Only those documents, recited in "CONTRACT III" (J. Ex. 2 at 12A-1 through 12J-65) are a part of the contract which is to be enforced strictly in:

"Accordance with plans, specifications, and form of proposal on file in the Office of the Chief Engineer, Department of Natural Resources, * * * [J. Ex. 2 (NOTICE TO BIDDERS) page denomination '1 of 2' and J. Ex. 3 at page 1.]"

A sizeable claim for overtime is included in the "carpet" group. $2,465.10, claimed for overtime required to meet the time of the scheduled opening. Allowances for overtime are consistently opposed by the defendant. Notwithstanding the testimony of plaintiff's witnesses that there had been oral allowance of overtime witnesses for the defendant steadfastly denied any allowance.

Mr. Backus testified that "my people" told me that Mr. Swartzmiller would pay for overtime when work was done at his direction. Plaintiff's witnesses, its employees John Schaal and Charles Mergy, both confirmed the belief that defendants supervisory employees, specifically Raidt and Swartzmiller, assured the plaintiff of overtime pay reimbursement. To the contrary, William G. Raidt, Project Supervisor, testified that he had no power to authorize payment for overtime and that at no time did he tell the plaintiff or its employees that overtime payment would be allowed.

Mr. Swartzmiller testified that he alone could approve change and overtime orders and emphatically denied having issued any such orders on the Salt Fork job. Further, Swartzmiller testified that the contractors were told at the preconstruction conference that the Chief Engineer alone could issue a change order that could cost additional money.

No evidence offered by the plaintiff in the course of this trial indicated the issuance of a change order by the Chief Engineer that granted payment of overtime wages. There is no denial of the instruction given at the precon-

struction conference as to the issuance of change and overtime orders. Without a preponderance of proof establishing the issuance of a proper order by an authorized person no overtime can be allowed.

The final group or item in Plaintiff's Exhibit A, numbered one in the bid schedule, concerns the installation of lighting fixtures in the lodge and units. As noted early in this discussion this decision is concerned with: "CONTRACT III—LODGE & UNITS—INTERIOR FURNISHINGS" (J. Ex. 3 at page 1). The contract is related to the plans and specifications by the language used in Article 3 (J. Ex. 3 at page 1), which itself provides that no changes can be made except by written order of the Director of the Department of Natural Resources. Such provision urges respect for and compliance with plans and specifications in all matters involved in the contract. A starting point for the discussion concerning this last segment of our present problem is found in those plans and specifications.

Section 12D of the specifications, titled Decorative Lighting (J. Ex. 2 at 12D-1), is the center of interest for this portion of the review. Paragraph 3, "INSTALLATION," is of special interest and reads as follows:

"All fixtures which must be wall or ceiling mounted to outlet boxes shall be delivered in perfect condition, complete with all hardware, accessories, special item, chain, bulbs and lamps, and manufacturers' instructions.

"The Interior Contractor shall coordinate with the Electrical Contractor to assure that provisions are made for the best hanging methods: however, the assembling and hanging shall be the responsibility of the Interior Contractor.

"The Interior Contractor must uncrate and unpack all other table/floor lamps and decorative fixtures and place and/or install and lamp same, leaving all fixtures clean and in perfect condition at Job completion."

The nub of the problem presented to this court is found in the language:

"[T]he assembling and hanging shall be the responsibility of the Interior Contractor."

Testimony of witnesses indicates that near the end

of construction a point was reached when electric lighting fixtures (to be mounted on walls and ceilings) were required to be installed. In order to make the lights operative the lighting fixture had to be both electrically connected and mounted.

Mr. Backus contends that the Interior Contractor could not make the actual electrical connection. He testified that the mounting and the electrifying could not be done cooperatively and essentially at the same time by the Interior Contractor and Electrical Contractor. Pursuant to his belief, Mr. Backus arranged with The Northwest Electric Company (see Plaintiff's Exhibit B) the Electrical Contractor on the job to "hang" the fixtures.

Mr. Backus admits securing Northwest to hang the light fixtures, but now takes the position that it was not his obligation to "hang" them since such work was properly that of the Electrical Contractor. Obviously, Northwest did not so regard it and accordingly Northwest billed the plaintiff, Backus Associates, for the work that was done.

The reason for the position taken by the Electrical Contractor seems to be supplied by the provision in his contract (J. Ex. 2 at 16A-37) concerning lighting fixtures. Paragraph J., page 16A-37, reads, as follows:

"Fixtures $MX$ and $X$ will be furnished, assembled, supported, hung lamped and final connection made under the sub-contract for interior decoration. Electrical Contractor to rough-in branch circuit wiring and outlet box only:".

The language used in the decorative lighting portion of the contract does not conflict with the portions applicable to the Electrical Contractor. When read together the contract makes plaintiff's duty clear.

Counsel for the plaintiff urges that the word "hanging" is the culprit and that it shall be given its ordinary meaning. That is an acceptable proposition and the Webster meaning that "hanging" is to attach to something above with no support from below is sufficiently descriptive as to apply to a ceiling and wall fixture.

The question presented here is a bit more complicated. The purpose of the hanging must be considered. The oper-

ation is not alone to display a thing of beauty, but also to install the fixture so as to produce light. The operation is not completed until the fixture is electrified. Merely attaching, or hanging, a fixture by fastening it to an outlet box leaves the job unfinished. The wires in the box must be attached to those in the fixture in order to get light. In this case "hanging" electrical fixtures included making appropriate electrical connections of the fixtures.

Frequently this kind of situation is the basis for a union jurisdictional dispute. There is no hint of such in the present fact pattern. In the ordinary situation, according to Ohio Industrial Relations Department Rules, no electrician is required by the state to make the physical connection necessary to electrify a fixture. Anyone who does the hanging can make the connection provided the actual connection conforms to the electrical code.

A contract can, as it did in this case, properly direct, an interior contractor to hang electrical fixtures. Since it was the responsibility of Backus under a contract with the department, it makes no difference if the job is done directly by Backus. Backus could (as was done) hire someone or some entity to hang the fixtures. The state has no obligation to pay if Backus elected to employ Northwest Electric to carry out the plaintiffs responsibility.

## Conclusion

The plaintiff relies heavily upon its Exhibit A to establish the specific items upon which its bid was based. In this contractual situation there is no possible substitute for plans and specifications in existence and available at the time of bidding. Whatever purpose, or purposes, may be served by Plaintiff's Exhibit A, such a list cannot be said to transform a bid and the resulting contract into a document conforming to requirements upon which both parties have agreed. Plaintiff's Exhibit A is plaintiff's summary of the contract; it is not the contract.

To accept the list supplied by the plaintiff as a part of the contract is to change the terms of a valid contract without the consent of the other party. Such an action is an attempt to unilaterally change the contract which cannot bind the state.

The sanctity of contract is long established and the sanctity must be respected and protected. In the instant case the contract proper is a compact and somewhat simple document. The plans and specifications are voluminous. However forbidding and overwhelming; the plans and specifications are a part of the contract:

"Where the plans and specifications are by express terms made a part of the contract, the terms of the plans and specifications will control with the same force as though physically incorporated in the very contract itself." 13 Ohio Jurisprudence 2d 15, Building and Construction Contracts, Section 12.

In sum, it should be said that the state of Ohio as the owner, or contractee, and party to a construction contract is not an insurer of the contractor. Specifically, the state of Ohio is not an insurer against delays in construction due to causes over which the state has no control. If the state of Ohio breaches a contractually created duty with resultant delay it is liable in damages. However, no duty arises when typical "acts of God," weather and the deliberate acts of persons over whom the state has control cause the delay.

For the reasons assigned, and as noted herein, the plaintiff is allowed compensation, as follows:

| | |
|---|---|
| 2 Additional Stencils | $ 50.00 |
| 2 Lobby Lights | $ 631.70 |
| Lead Nosing for Mirror Hanging | $ 630.00 |
| Booth Installation | $ 86.94 |
| Lavatory Lights | $ 745.20 |
| Total | $2,143.84 |

Judgment is for the plaintiff, Backus Associates, Inc., in the sum of $2,143.84.

Costs are to be paid by the defendant, state of Ohio, Department of Natural Resources.

*Judgment for plaintiff.*