## JULIAN SPEER COMPANY

v.

## OHIO STATE UNIVERSITY et al.

Court of Claims of Ohio.

No. 95–06877.

Decided Feb. 3, 1997.

94

*Luther L. Liggett, Jr.,* and *Warren I. Grody,* plaintiff.

*Betty D. Montgomery,* Attorney General, and *William C. Becker,* Assistant Attorney General, for defendants.

FRED J. SHOEMAKER, Judge.

Plaintiff, Julian Speer Company, filed this breach-of-contract claim against defendants, Ohio State University ("OSU") and Ohio Department of Administrative Services ("DAS"). Defendants denied any liability to plaintiff and the court held a trial commencing on August 19, 1996. At the conclusion of the trial and at the suggestion of the parties, the court set forth a schedule that required proposed findings of fact and conclusions of law to be filed by October 16, 1996, and replies to those proposals to be filed by October 28, 1996. Having considered the evidence, the arguments of counsel, and the law, the court renders the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. In early 1992, the state of Ohio began accepting bids for the construction of State Project No. 315–89–126, the Vernal G. Riffe, Jr. Building, Bio Science Parks/Hall Addition on the OSU campus ("the project");

2. The state's associate architect, Burgess and Niple, Limited, prepared the plans and specifications for the project on behalf of the state and in particular DAS, Division of General Services, and the Office of the State Architect and Engineer;

3. DAS is the state department charged with supervising and managing all of the state's agents performing services on the project;

4. The state awarded plaintiff a prime contract to provide plumbing services for the project by way of a written contract dated August 12, 1992. The state gave plaintiff notice to proceed on August 25, 1992, with a scheduled completion date of July 1, 1994;

5. For purposes of the project, the Sherman R. Smoot Co. ("Smoot"), which was awarded the prime contract for general trades work, is an agent of the state as to plaintiff, even though Smoot is an independent contractor and otherwise not an agent for other purposes to the state;

6. Plaintiff's claims center around the plumbing services required by the plans in four specific areas on the project. The four areas are (1) the installation of science laboratory fume hoods (fume hoods), (2) the installation of a distilled water faucet, (3) the installation of cold water fixtures, and (4) the resulting changes of the dimensions of the related cabinet-case work;

7. The bulk of plaintiff's claim against defendants concerns whether the project's plans and specifications required plaintiff to make internal piping connections within the laboratory fume hoods;

8. Fume hoods are enclosed laboratory fixtures that allow various fumes and by-products from scientific research experiments to be vented through the top of these structures or otherwise cleared through piping. The plans and specifications called for fume hoods on the first floor and floors four through nine of the project for a total of eighty fume hoods;

9. The contract required the state's prime general contractor, Smoot, to purchase the fume hoods for the project. Smoot's subcontractor, Smith & Schaefer, Inc., ordered and received the fume hoods from the manufacturer, Fisher Hamilton Scientific, Inc. Plaintiff had no way of knowing what type of fume hood would be purchased because the entire purchase and operational certification of the fume hoods were the responsibility of Smoot;

10. The two relevant project specifications referencing the installation of fume hoods, available to plaintiff at the time of bid, were Section 11610–LABORATORY FUME HOODS and Section 15452–INSTALLATION OF FIXTURES AND EQUIPMENT FURNISHED BY THE GENERAL CONTRACTOR. Neither Section 11610 nor Section 15452 expressly required plaintiff to provide internal fume-hood piping;

11. Section P15432 of the specifications mandated that Smoot provide drawings to indicate where plaintiff should furnish and install valves;

12. Originally, specification Section 12345 expressly mentioned internal piping. However, this section was revised prior to the bid to delete the internal piping reference and instead referred plaintiff directly to the drawings, which do not provide enough detail to illustrate what piping is necessary to make final connections on the fume hoods;

13. Sheet P20 of the drawings included in the plumbing contractor's bid documents shows three connections required by the plumbing contractor, as opposed to as many as six connections plaintiff ultimately had to complete on each fume hood;

14. Plaintiff's project manager requested connection drawings or "rough-in" information regarding the fume hoods. In September 1993, Smith and Schaefer's representative sent a manufacturer's catalogue sheet entitled "TECHNICAL

ROUGH–IN INFORMATION." The sheet showed hood details with solid internal lines indicating interior hood piping supplied by the manufacturer, and one set of four connectors;

15. Subsequently, during February 1994, plaintiff received a second manufacturer's catalogue sheet also entitled "TECHNICAL ROUGH–IN INFORMATION," which contained fume-hood details with dotted lines indicating interior hood piping as optional;

16. The state's associate architect testified that the fume hoods' interior piping could be configured at least three ways, all of which required his approval, and one of which may not be building-code compliant. Since there were no technical rough-in drawings available in the bid project plans and specifications for the project, the associate architect sketched the fume-hood internal piping requirements for the project for the first time during the trial;

17. In February 1994, when plaintiff objected to supplying and completing the interior piping for the fume hoods, Smoot threatened to complete the work itself and then charge plaintiff for the work. Therefore, plaintiff supplied and installed the fume-hood internal piping;

18. By letter dated December 10, 1994, the state's associate architect informed plaintiff that the state would not provide any further compensation for interior fume-hood piping work;

19. Plaintiff's second claim requested $1,492 in compensation because defendant OSU's agent required plaintiff to relocate the distilled water faucet contrary to the project specifications or drawings. Defendants waited until the trial commenced to admit liability for this count of plaintiff's complaint;

20. Plaintiff's third claim is for $5,685 for installing cold water fixtures of differing sizes and locations on lab benches contrary to the project specifications or drawings. Defendants initially maintained, by way of a January 1, 1994 letter from the state's associate architect, that "[t]his work must be coordinated with other trades. Any costs generated by lack of coordination must be borne by the responsible contractor, not by the State of Ohio." At trial, defendants changed their reason for denying this claim and asserted that the changes were the result of plaintiff's attempt to prefabricate plumbing off site and that plaintiff had a duty to make measurements at the site prior to such prefabrication;

21. Plaintiff's fourth claim seeks recovery for changes in the dimensions of the cabinet-case work. Defendants blamed these discrepancies on plaintiff's lack of coordination with the other contractors;

22. Plaintiff contends that it is entitled to an award of attorney fees, pursuant to R.C. 119.092 and 2335.39, because the state was not substantially justified in initiating this controversy.

## CONCLUSIONS OF LAW

1. As the owner of the project, the state has the obligation to furnish sufficient plans and specifications to enable the plumbing contractor to prepare a bid and perform any resulting contract. *Bates & Rogers Constr. Co. v. Cuyahoga Cty. Bd. of Commrs.* (N.D.Ohio 1920), 274 F. 659;

2. Burgess & Niple, the state's associate architect and the project's design professional, is the state's agent, and the state is therefore liable for any errors or omissions by its design professional that result in additional costs to contractors, such as plaintiff. *Mason Tire & Rubber Co. v. Cummins–Blair Co.* (1927), 116 Ohio St. 554, 157 N.E. 367;

3. If conditions change or the specifications are amended by the state or its agents, then the state is in breach of its contract, and the contractor is entitled to any extra costs as a result of the discrepancies between the bid plans and the project as built. *Backus Assoc., Inc. v. Ohio Dept. of Natural Resources* (Ct. of Cl.1976), 47 Ohio Misc. 11, 1 O.O.3d 211, 352 N.E.2d 663; *Valentine Concrete, Inc. v. Ohio Dept. of Adm. Serv.* (Ct. of Cl.1991), 62 Ohio Misc.2d 591, 600–601, 609 N.E.2d 623, 628–629;

4. The state is responsible to provide the contractor with an adequate building site, and the contractor can recover against the state for the state's failure to coordinate the project if this failure amounts to the state's inability to provide the contractor with a building site. *Valentine Concrete, Inc. v. Ohio Dept. of Adm. Serv.* (Ct. of Cl.1991), 62 Ohio Misc.2d 591, 617, 609 N.E.2d 623, 639;

5. The state's verbal instructions to build the project other than as included in the specifications create a "constructive change order" that is a proper basis to allow recovery of additional costs. *Valentine Concrete, Inc. v. Ohio Dept. of Adm. Serv., supra,* 62 Ohio Misc.2d 591, 601, 609 N.E.2d 623, 629;

6. The court concludes that plaintiff could not have determined whether the fume hoods were going to include internal piping by looking at the project plans and specifications. Moreover, the plans, specifications and drawings that were provided seemed to reflect that all plaintiff would need to complete the project would be to "rough-in" the final plumbing connections, not install piping internal to the fume fixtures themselves; therefore, defendants did not provide plaintiff with the proper plans, specifications or building site to complete the contract;

7. In addition to installing the fume hoods as required by the project plans and specifications, plaintiff also supplied and completed internal piping for them. Consequently, the court finds that plaintiff's request for $44,715 in damages for

supplying and completing internal piping for the fume hoods is a reasonable damages award that is supported by the evidence;

8. The court finds that plaintiff's request for $1,492 to relocate the distilled water faucet is a reasonable damages award which is supported by the evidence;

■ 9. The court concludes that plaintiff had a right to rely upon the project plans and specifications in determining the location and type of cold water fixtures to install on the laboratory benches. Since plaintiff ultimately had to install cold water fixtures contrary to the plans, the court finds that $5,685 is a reasonable amount of damages that is supported by the evidence for changes in the location of the cold water fixtures;

■ 10. The court concludes that the state's failure to coordinate the project caused plaintiff to make changes in the dimensions of the cabinet-case work. Plaintiff's request for $315 is a reasonable amount of damages that is supported by the evidence for changes in the cabinet-case work;

11. The court shall render judgment in favor of plaintiff in the amount of $52,207;

■ 12. Plaintiff is entitled to prejudgment interest on its award of damages from its date of substantial completion of the project. R.C. 2743.18(A). See, also, *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1993), Ct. of Cl. No. 90–05520, unreported, at 23–24, reversed and remanded in (Dec. 21, 1993), Franklin App. Nos. 93AP–399 and 93AP–424, unreported, 1993 WL 532013, reversed in (1995), 73 Ohio St.3d 110, 652 N.E.2d 687;

13. The court concludes that the evidence proved that plaintiff substantially completed its plumbing duties on the project on February 22, 1994. Pursuant to R.C. 1343.03, plaintiff is entitled to interest at the rate of ten percent per annum on its breach-of-contract damages, commencing on February 22, 1994;

■ 14. Finally, the court concludes that plaintiff is not entitled to an award of attorney fees. The general rule in Ohio is that attorney fees cannot be taxed as costs of the action absent specific statutory authority. *Sorin v. Warrensville Hts. Bd. of Edn.* (1976), 46 Ohio St.2d 177, 75 O.O.2d 224, 347 N.E.2d 527. Although plaintiff makes a novel argument that it is entitled to attorney fees pursuant to R.C. 119.092 and 2335.39, the court finds that those statutes apply in situations where the state has initiated the matter in controversy, not in cases where a plaintiff has sued the state of Ohio in this court, and, in this case, plaintiff has not proven it is entitled to attorney fees.

For all the foregoing reasons, judgment shall be rendered for plaintiff, Julian Speer Company, and against defendants, Ohio State University and Ohio Department of Administrative Services, who are jointly and severally liable for the

breach of contract. See *Conti Corp. v. Ohio Dept. of Adm. Serv.* (1993), 90 Ohio App.3d 462, at 466, 629 N.E.2d 1073, 1075; R.C. 2743.19.

## JUDGMENT ENTRY

The court has considered the evidence and rendered the findings of fact and conclusions of law filed herein. Judgment is rendered in favor of plaintiff, Julian Speer Company, and against defendants, Ohio State University and Ohio Department of Administrative Services, which are jointly and severally liable to plaintiff in the amount of $52,207. Plaintiff is also awarded prejudgment interest in the amount of ten percent per annum commencing on February 22, 1994. Court costs are assessed against defendants. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

*Judgment for plaintiff.*

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.